398 A.2d 957

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Charles STICKLE, Appellant.**

Supreme Court of Pennsylvania.

Argued Nov. 13, 1978.

Decided March 14, 1979.

92

Paul M. Perlstein, Philadelphia, for appellant.

Robert B. Lawler, Chief, Appeals Div., Asst. Dist. Atty., Gaele McLaughlin Barthold, Asst. Dist. Atty., Philadelphia, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, MANDERINO and LARSEN, JJ.

## OPINION OF THE COURT

EAGEN, Chief Justice.

Appellant, Charles Stickle, was arrested and charged with two counts of murder generally, of kidnapping, and of rape in connection with an incident involving two teenage girls, Beverly Rodenbaugh and Tina Statuti. Stickle, in connection with the same incident, was also charged with arson, criminal conspiracy, and causing or risking a catastrophe. At trial, demurrers to the charges of rape and causing or risking a catastrophe were sustained. The jury found Stickle guilty of murder of the first degree and of kidnapping on

two counts each, in addition to the charges of conspiracy and arson. Post-verdict motions were denied. Thereafter, Stickle was sentenced to consecutive life sentences on the murder convictions. Maximum probationary terms were imposed as a result of the convictions on the other charges, such probationary periods to run consecutively to each other but concurrently to the judgments of sentence on the murder convictions. A direct appeal to this Court was taken from the judgments of sentence imposed on the murder convictions. The orders imposing probation were appealed to the Superior Court which certified that appeal to this Court.

The facts giving rise to this appeal are as follows:

At approximately 12:30 a. m. on May 10, 1975, a security guard at the Container Corporation of America heard an explosion and observed a large ball of fire rising from the corporation's tractor trailer lot which is situated in a remote industrial area in the Manayunk section of Philadelphia. He immediately proceeded to the lot and saw one of the trailers, which was stored there, on fire. At the same time, he observed a "ball of fire coming from the trailer on all fours." He thought it to be "a dog or cat or something on fire"; but, as he turned his light on the "ball of fire," he discovered it was a human being, later identified as Beverly Rodenbaugh, engulfed in fire. Taking immediate action, he was able to douse the flames surrounding the conflagrant victim. He then attempted to remove Miss Rodenbaugh from the area but, because she was badly burned and because she had crawled between the rear wheels of an adjacent trailer, he was unable to do so.

Within minutes of the explosion, units of the Philadelphia police and fire departments arrived at the scene. They discovered the charred body of a second victim, Tina Statuti, inside the still blazing trailer. An autopsy revealed Miss Statuti had died as a result of "thermal burns and smoke inhalation."

Using the "jaws of life," rescue units were able to extricate Miss Rodenbaugh from between the wheels of the

second trailer. She was given emergency medical attention at the scene and was then transported via ambulance to Roxborough Memorial Hospital where she was classified by medical personnel as "extremely critical." Physicians at Roxborough decided to transport Miss Rodenbaugh to St. Agnes Burn Center. Approximately one month after the explosion and fire, Beverly Rodenbaugh died as a result of "extensive thermal burns" sustained in the fire.

In this appeal, Stickle complains of twelve alleged errors in the prosecution process. For reasons stated herein, the judgments of sentence and orders will be affirmed.

■ Stickle complains error was committed because the search warrant used to obtain hair, blood, and nail scrapings from him was invalid since "factual allegations asserted therein were patently false at the time they were made." However, Stickle made no effort in his pretrial "Motion to Suppress" to apprise the suppression court of specific factual falsities contained in the warrant and, therefore, has not preserved this issue. Pa.R.Crim.P. 323(d); *Commonwealth v. Dussinger*, 478 Pa. 182, 386 A.2d 500 (1978).

■ Stickle next complains the warrant was invalid because it did not contain a statement of the purpose of the warrant. However, the warrant clearly states on its face that it was to be used to obtain hair, pubic hair, fingernail scrapings, toenail scrapings, and a blood sample.

■ He further complains the search warrant was invalid because it contained no statement as to the reliability of the informant. The probable cause for the issuance of the warrant consisted of a recitation of the facts and circumstances surrounding the incident, a statement to police by a co-defendant implicating himself and Stickle, and a corroborating statement by Miss Rodenbaugh, one of the victims. Where a person is an admitted participant in a crime and police secure a search warrant upon information received from him, affiant-officers need not support their claim that the informant was credible or his information reliable since the individual's admission of participation in the crime in-

sures his reliability. *Commonwealth v. Matthews*, 446 Pa. 65, 285 A.2d 510 (1971). This is especially true where, as here, the incriminating statement of a co-defendant is accompanied by corroborating evidence.

■ Stickle next maintains that the trial judge erred in refusing to allow his counsel, during voir dire, to inquire whether prospective jurors had an opinion regarding Stickle's guilt and that the court erred in refusing to allow questions concerning "the prevailing attitude in the community" to be asked of the prospective jurors.

The trial judge allowed defense counsel wide latitude in the examination of prospective jurors and permitted questions which would reveal whether a juror had formed a fixed opinion as to Stickle's guilt. " 'While considerable latitude should be permitted on a voir dire, *the inquiry should be strictly confined to disclosing qualifications of a juror and whether a juror has formed a fixed opinion or may be otherwise subject to disqualifications for cause.*' *Commonwealth v. McGrew*, 375 Pa. 518, 525, 100 A.2d 467, 470 (1953)." [Emphasis in original.] *Commonwealth v. Johnson*, 452 Pa. 130, 134–5, 305 A.2d 5, 7 (1973). See also *Commonwealth v. Pass*, 468 Pa. 36, 360 A.2d 167 (1976); *Commonwealth v. Biebighauser*, 450 Pa. 336, 300 A.2d 70 (1973). We find no error in the challenged rulings.

■ Stickle next maintains he is entitled to a new trial because exculpatory information known to the district attorney was not disclosed to the defense prior to trial. He contends the nondisclosure was violative of the holding of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) [hereinafter: *Brady*]. Instantly, no specific request for the information was made. Therefore, error was committed only if the nondisclosed evidence could have created a reasonable doubt as to guilt. *Commonwealth v. Rose*, 483 Pa. 382, 396 A.2d 1221 (1979). In order to make this determination, we must review the record as a whole. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

At trial, overwhelming evidence was presented to establish Stickle's guilt. In the two hours immediately following the conflagration, Miss Rodenbaugh detailed the events which preceded the fire and explosion to various police and medical personnel, and this account was introduced into evidence at trial. She stated she and Miss Statuti had been choked, beaten, and raped by a "Charles Sheppard" (the alias of Charles Stickle). She also stated that, before passing out from the choking, she remembered Stickle pouring gasoline over herself and Miss Statuti. Various witnesses testified Miss Rodenbaugh smelled of gasoline when admitted to Roxborough Memorial Hospital immediately following the incident.

A fire marshal testified the explosion and resulting fire were caused by the ignition of gasoline vapors by an open flame. He testified that nothing had been stored in the trailer which could have caused the explosion or fire and that no accidental source of the explosion could be found.

A woman named Debra Dietrich testified that she spoke with Stickle on the day of the incident at his residence at the French Creek Inn and that he told her he was angry because a friend had been beaten up and he was waiting for two girls to arrive who supposedly knew why the beating had occurred. Thereafter, she saw Miss Rodenbaugh and Miss Statuti arrive at Stickle's residence at the French Creek Inn.

Miss Dietrich, subsequent to the incident, rendered assistance to Stickle. On the following Sunday evening, she drove Stickle to a motel in Malvern where she cared for him, fed him, and sheltered him from the police. She testified Stickle's face and arms were badly burned. She also testified that she discussed the incident with Stickle and that, when he watched the news about the incident: "He used to laugh about it. He thought it was very funny. He couldn't understand how the girl was alive when he himself poured gasoline on her and lit the fire."

The following Friday, she drove Stickle to New Jersey to the residence of William Scull who was to take care of him from that time on. She testified she was promised three thousand dollars for her efforts.

William Scull testified Miss Dietrich brought Stickle to his home in Trenton approximately one week after the crimes. He stated he was to be paid five thousand dollars to care for Stickle and treat his burns. Scull further testified Stickle also expressed disbelief to him that Miss Rodenbaugh was still alive. Stickle was under Scull's "supervision" until his arrest by Trenton police on unrelated charges.

Additionally, the Commonwealth presented evidence that a gun found at the scene of the explosion and fire was similar to a gun which had previously been in Stickle's possession; that the victims' purses were found beneath a manhole in the parking lot of the French Creek Inn in an area adjacent to Stickle's residence; that a paint bucket and a blanket, found at the scene of the explosion and fire, and dungarees, worn by Stickle the evening of the incident and later found at the French Creek Inn, all contained traces of gasoline; that the paint bucket, blanket, and dungarees were stained from the same type of paint; that a tee-shirt worn by Stickle the night of the incident was infused, due to a "tremendous amount of heat," with fibers from a brown sweater which burned off Miss Rodenbaugh during the fire; that towels containing blood stains were found in the immediate vicinity of the area where Stickle's clothes were found; that the blood type found in the towels matched Stickle's blood type which is found in only ten percent of the population; that Stickle had burns of the arms, hands, face and neck; that Stickle told Scull the burns were caused by gasoline; and, that microscopic examination revealed Stickle's hair had been singed by "excessive heat."

In support of his complaint that a violation of *Brady*, supra, occurred, Stickle first cites the fact that the district attorney failed to inform his counsel, prior to trial, that no gasoline vapors were found in the Stickle automobile when it was tested by the police and that no tire tracks matching Stickle's vehicle tires were found at the crime scene. In view of the overwhelming evidence of Stickle's guilt, before related, these additional facts would hardly be sufficient to create a reasonable doubt as to guilt. Hence, in these

instances, there was no violation of *Brady*. Cf. *Commonwealth v. Rose*, supra. Also, and very importantly, the absence of the vapors and the tire marks was disclosed to the jury during the trial.

Stickle also says a *Brady* violation occurred because the district attorney did not voluntarily disclose the lack of a presence of sperm on a tampon removed from the victim at the hospital. This is contrary to the record which establishes that, at least one week prior to trial, this information was, in fact, voluntarily disclosed to the defense by the district attorney.

Stickle next claims a *Brady* violation occurred because the district attorney did not voluntarily disclose to the defense that no gasoline traces were found in his dungarees. This again is not correct factually. A criminalist for the Philadelphia Police Department testified at trial that, by applying a technique called "gas chromatography," he was able to determine that gasoline traces were, in fact, present in the dungarees. Thus, the alleged factual basis upon which the *Brady* claim is based, quite simply, does not exist.

■ Stickle next argues his constitutional rights were violated because he was denied adequate forensic assistance during his trial in that sufficient monies were not provided to the defense for the hiring of various experts. This claim is also without merit and ignores important facts.

Prior to trial, the defense was allowed, "to start with," a minimum of $650.00 for the hiring of various experts to assist them prior to and during the trial. At the time the money was allotted, the defense was informed by the court that:

> "[A]ny expert evidence you want, you hire . . .. If it is before trial and you need someone and you hire them I will sign an appropriate order designating funds for that person. Don't overspend, be cautious and considerate, but I want you to have the money to properly defend your client."

Thereafter, no further request for funds was made until the trial had begun. At that point, the defense asked "that

whatever moneys are necessary" be made available to pay for analysis of evidence at the John Jay College of Criminal Justice in New York City. In response, the court stated:

"I will not order the moneys necessary until it is a time when the Court can review the bills and determine if they are proper. I cannot order a carte blanch[e] credit card for you to do what you like with. I will have to review the bills to see if they are proper."

At no point does Stickle assert the $650.00 "starting sum" made available pretrial for the hiring of witnesses was ever expended. He gives no indication of the number or type of expert witnesses he feels were required to prepare an adequate defense for this case. The funds allotted pretrial were specifically made available for the hiring of a medical doctor, an investigator, a pyro technician, and appropriate experts to review the physical evidence. Whether the latter three experts were ever hired by the defense, after the funds were made available, is not disclosed by the record. Thus, no basis exists for claiming the trial court denied Stickle sufficient funds to obtain adequate forensic assistance, either pretrial or during trial.

Stickle next argues "all scientific, physical and photographic evidence, despite court order, was not made available to the defense." Though his argument lacks specificity, it appears Stickle is claiming he was prejudiced because the results of and photographs from certain scientific tests were not made available to him. However, the October 8, 1975, pretrial order concerning scientific evidence, made concomitant with the order authorizing the funds for the hiring of an "appropriate expert," specifically stated:

"The district attorney is to make available to defense counsel or his representative the victim's clothing and the defendant's clothing, any blood, hair, or fingernail scrapings, of the defendant or the victim *to be analyzed by an appropriate expert witness which the defense may wish to employ.*" [Emphasis added.]

Thereafter, the defense filed a "Motion to Dismiss Indictments" based upon the district attorney's alleged failure to

comply with the October 8, 1975, order. On November 18, 1975, after a hearing, the motion was dismissed. On that date, since there was a dispute whether the district attorney had complied with the October 8th order, the judge reiterated that the *specific physical evidence*—"[h]is clothing, the victim's clothing and the defendant's clothing, any blood, hair, or fingernail scrapings of the defendant or the victim" —and not results of testing, was to be made available to the defense at a set date and time "to be analyzed by [an] appropriate expert witness which the defense may wish to employ." The district attorney complied with the order.[1]

In arguing that the scientific reports should have been made available, Stickle has ignored the specific wording of the pretrial order.

■ Stickle next complains about the evidentiary use of Miss Rodenbaugh's statements made during a one to one and one-half hour period immediately following the conflagration. He contends the statements were not admissible because they did not fall within either the dying declaration or res gestae exceptions to the hearsay rule.

"We have noted before that 'the admissibility of such evidence depends primarily upon the state of the declarant's mind.' *Commonwealth v. Smith*, 454 Pa. 515, 518, 314 A.2d 224, 225 (1973). An assumption of trustworthiness arises from the declarant's knowledge, at the time the statement is made, that death is imminent. Such knowledge 'may be inferred from the existing circumstances including the nature of the wound and state of the declarant's illness.' *Commonwealth v. Smith*, supra." *Commonwealth v. Stasko*, 471 Pa. 373, 382–3, 370 A.2d 350, 355 (1977).

1. In fact, the district attorney was not found by the court not to have complied with the prior order. While the defense argued noncompliance, the district attorney on the record, stated: "I have had no request by anyone to see anything. I don't think it's my responsibility to do the work for them. They have been available. No one asked me, 'Can I come in tomorrow and see them.'" Defense counsel responded they had been informed the evidence was temporarily unavailable and had not been told when it had again become available.

■ Miss Rodenbaugh was "burned very severely" with "full skin thickness" burns over much of her body. She consistently moaned she was in pain and more than once stated, "I'm going to die." Though death did not occur until some time later, the requisite state of mind was clearly present during the one to one and one-half hour period following the explosion and fire when the statements were made. Thus, the victim's statements are admissible under the dying declaration exception to the hearsay rule.[2]

Stickle also claims various witnesses were allowed to testify as experts who were not properly qualified. "[T]he question whether a witness is qualified to testify as an 'expert' is within the sound discretion of the trial court and will not be overturned except in clear cases of abuse." *Commonwealth v. Bennett*, 471 Pa. 419, 424, 370 A.2d 373, 375 (1977).

■ Specifically, he contends Lieutenant Robert Quinn of the Philadelphia Police Department did not possess qualifications to enable him to testify as an expert witness concerning the cause of the explosion and fire. The record indicates Lieutenant Quinn was employed by the city as a fire marshal for approximately six years prior to the trial. Before being commissioned as fire marshal, he had been a regular member of the fire department for eight years. For five of the eight years, he was a regular fireman, and during the following three years, he was a fire officer. In his capacity as fire marshal, he had attended in-service training sessions as well as outside seminars. He was appointed the assigned fire marshal for over two thousand fires and had previously testified as to the cause and origin of fires at over

2. Stickle also argues an in-camera determination regarding the admissibility of the statements should have been made. However, having determined that the statements were properly admitted by the trial court as a matter of law, *Commonwealth v. Cooley*, 465 Pa. 35, 348 A.2d 103 (1975), evidence relating the circumstances under which the statements were made was properly presented to the jury to enable them to evaluate the weight to be afforded the statements. 5 Wigmore, Evidence § 1451(b) at 768 *et seq.* (Chadbourn rev. 1974); cf. *Commonwealth v. Edwards*, 431 Pa. 44, 244 A.2d 683 (1968).

three hundred trials. Based upon this record, it was not an abuse of discretion for the trial court to allow the witness to testify as to the cause and origin of the explosion and fire. See *Commonwealth v. Smallwood,* 465 Pa. 392, 350 A.2d 822 (1976).

██ Stickle's claim that Dr. Frederick DeClement, Associate Professor of Surgery at Hahnemann Medical College and Director of the Burn Center at Saint Agnes Hospital, was not qualified to testify concerning the nature and extent of Beverly Rodenbaugh's injury and the age of the burns on Stickle's arms is utterly without merit. The contentions that Dr. DeClement was not properly qualified and that there was no basis for the opinions he rendered do not find support in the record.

██ It is also alleged error was committed because two police detectives testified that photographs of Stickle, taken a month after the incident occurred, depicted burn marks. Stickle claims the testimony was "expert testimony" by witnesses not properly qualified. The record discloses the testimony by the detectives concerning the marks on Stickle's arms was cast in terms of what the marks appeared to be, rather than as positive statements of fact.

"[I]t is appropriate to make a distinction between a conclusion which is cast in the form of an appearance and one that represents a positive statement of fact." *Commonwealth v. Schroth,* 479 Pa. 485, 388 A.2d 1034, 1038 (1978). In the instant case, the "appearance testimony" was accompanied by descriptions of the marks as "a definite redness, a rash" and "large blotches—red blotches on the inside of both arms." In this context, testimony that the photographs depicted "what appears to be burn marks" is not the type of testimony which requires a witness possess "expertise" and thus, it was admissible.

██ Stickle also argues a nurse on duty in the emergency room where Miss Rodenbaugh was taken immediately after the accident was improperly allowed to testify as an expert witness on four specific matters because she was "without qualification."

Stickle argues she should not have been allowed to testify to the degree of burns suffered by Miss Rodenbaugh. The record establishes this witness was a board certified registered nurse since 1963. For five years prior to the trial, she was employed by Roxborough Memorial Hospital, and for approximately three years prior to the incident, she was assigned to the emergency room. During that time, she treated a number of persons suffering from burns of various degrees. On this basis, she was qualified to testify that Miss Rodenbaugh "was suffering from third degree or full skin thickness burns of both upper extremities, both lower extremities, her face and her neck, first and second degree burns on her entire thorax, abdomen."

Stickle next argues this witness should not have been allowed to testify that Miss Rodenbaugh's medical classification was "extremely critical" and that she was going to die. The witness testified she had received training while in nursing school and in an on-going education process, as well as on-the-job instruction and training from medical personnel which would enable her to make a determination of "people in extreme condition, people that are about to die" by evaluating different systems of the body, such as vital signs along with a patient's symptoms. In fact, however, the witness never testified Miss Rodenbaugh was going to die as the result of having been burned. Rather, in response to the question whether Miss Rodenbaugh would die, the witness stated: "In my opinion Beverly Rodenbaugh's condition was extremely critical." This witness possessed the skill, knowledge and training to enable her to render such testimony and, therefore, the testimony was admissible.

Stickle also argues the witness was not qualified to proffer testimony concerning Miss Rodenbaugh's mental condition during the one to one and one-half hour period she was at Roxborough Hospital. The testimony consisted of statements that the patient was alert at all times; that she was oriented; that she was in pain; and that she manifested concern about her condition. No expert qualifications were necessary to so testify.

■ Stickle next argues the admission into evidence of testimony recounting an examination by Dr. DeClement to determine the age of the burn marks on his arms was error because a search warrant, rather than a court order, was the proper means of securing the examination. The examination was of an area constantly exposed to the public, and did not result in any unreasonable bodily intrusion. Furthermore, Stickle was under lawful arrest at the time the examination was made. As such, a search warrant was not required for the examination. *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *United States v. Mara*, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973); *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). See also *United States v. Allen*, 337 F.Supp. 1041 (E.D.Pa.1976).

■ Further, the fact that the doctor "may have" touched Stickle's arm incident to the course of the court ordered "visual" examination does not render Dr. DeClement's testimony inadmissible.

■ Stickle's next complaint relates to the issue of testimonial competency. Dr. Francine Miller, coordinator of emergency medicine at Roxborough Memorial Hospital, was present in the emergency room when Miss Rodenbaugh was brought to the hospital for treatment. She testified regarding Miss Rodenbaugh's appearance, the course of emergency treatment provided, the extent of injury she suffered, her reaction to events which took place, and her mental condition. When asked during direct examination whether the victim made any statements as to how her injuries occurred, Dr. Miller testified using phrases such as: "I vaguely remember . . . . I think I recall . . . ." and, "I thought she said." Because of this, Stickle asserts that Dr. Miller was incompetent to testify concerning the victim's statements and, further, that the testimony was improper because it was a summary of the witness' impressions.

■ During the course of cross-examination, the witness explained she used such phrases because, while "I can't

quote her verbatim . . .. I'm trying to get as close to the context as I possibly can . . .. I'm quoting her to the best of my recollection . . .. I would assume that it's as close as I possibly can be."

"The competency of a witness is a matter for the trial court to determine and is not reviewable in the absence of a clear abuse of discretion. *Commonwealth v. Ware,* 459 Pa. 334, 356, 329 A.2d 258, 269 (1974); *Commonwealth v. Kosh,* 305 Pa. 146, 155, 157 A.2d 479, 482 (1931)." *Commonwealth v. Baker,* 466 Pa. 479, 484, 353 A.2d 454, 457 (1976).

Allowing Dr. Miller to testify was not an abuse of discretion.

"[T]he result of a witness' observation *need not be positive or absolute certainty.* Such a degree of certainty cannot be demanded, even in theory . . .; it suffices if [the witness] had an opportunity of personal observation and did get some impression from this observation." [Emphasis in original.] 2 Wigmore, Evidence § 658 at 768 (3d ed. 1940).

Where a witness has observed an occurrence and formed an impression thereof, the fact that, at the trial, due to the passage of time and the fading of memory, she is not able to state with positive or absolute certainty *exactly* what she observed, but only what "I think" or "I vaguely remember" occurred, will not preclude the introduction of the witness' testimony.

"The deficiency comes merely in the quality of h[er] recollection . . .. [T]he law makes no objection on such grounds. It welcomes whatever quality of recollection [the witness] is able to bring." [Footnote omitted.] *Id.*

Finally, Stickle argues prejudicial evidence of little or no probative value was presented to the jury and, as a result, he is entitled to a new trial. Specifically, he asserts evidence of Miss Rodenbaugh's physical condition "went beyond that necessary to qualify a dying declaration but rather served no purpose but to inflame the minds of the jurors."

"If by 'inflamed' it is meant this evidence was damaging to [the] defense, this is true, but it does not follow that because of this its admission constituted error." *Commonwealth v. Smalls*, 460 Pa. 436, 441, 333 A.2d 853, 855 (1975).

In the instant case, evidence relating to Miss Rodenbaugh's physical condition at the time the statements were made was properly presented to the jury because it was relevant to the jury's determination of the weight to be afforded the statements admitted as dying declarations. See n.2, infra. "All of the prosecution's evidence is intended to prejudice the defense. Simply because it is damaging to the defense is no reason to exclude the evidence." *Commonwealth v. Green*, 477 Pa. 170, 176, 383 A.2d 877, 880 (1978).

Similarly, while damaging, the evidentiary use of a possibly "unflattering" photograph which depicted Stickle's appearance, including burns of the arm, did not constitute error.

In summary, we find no reversible error in the proceedings, and, as this opinion demonstrates, the evidence clearly warranted the findings of murder of the first degree.

Judgments and orders affirmed.

POMEROY, former J., did not participate in the consideration or decision of this case.