602 A.2d 1265
**COMMONWEALTH of Pennsylvania, Appellant,**

**v.**

**Carlos Eugene MOOSE, Jr., Appellee.**

Supreme Court of Pennsylvania.

Submitted May 6, 1991.
Decided Jan. 22, 1992.

220

H. Stanley Rebert, Dist. Atty., for appellant.

Allen H. Smith, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

CAPPY, Justice.

The principal question we are called upon to decide is whether statements surreptitiously obtained by a jailhouse informant from appellee awaiting trial violated appellee's Sixth Amendment rights when admitted against him in that trial, where the informant was acting pursuant to "an implied understanding" with the district attorney. For the reasons that follow, we hold that appellee's Sixth Amendment rights were violated, that such statements should not have been admitted, and that a new trial is required.

The gravamen of appellee Moose's complaint is that the district attorney's office entered into an "understanding" with one Sonny Oglesby, a prisoner, whereby Oglesby fed information to the district attorney's office—including an alleged confession made by Moose. In return for this information, the district attorney had not moved for sentencing on Oglesby's murder and robbery convictions, but had left him unsentenced in the county jail for over three years.

## PROCEDURAL HISTORY

On February 10, 1988, a complaint was filed against Carlos Moose (a/k/a Zeke) and Quinterio Smart (a/k/a Poncho) for the rape and murder of Judy Ketterman. On April 1, 1988, Moose's counsel requested discovery material which included, among other things, copies of all statements of either of the defendants or witnesses and police reports, as well as any exculpatory information. The district attorney, H. Stanley Rebert, did not comply with that request.

On April 5, 1988, the district attorney obtained a statement from Sonny Oglesby that contained incriminating statements allegedly made by appellee. On May 2, 1988, having received no discovery, defense counsel filed a formal application for discovery. On May 31, 1988, an evidentiary hearing was conducted and the requested materials—excluding the statement of Oglesby—were ordered to be made available.

On June 10, 1988, defense counsel again sent a letter to the district attorney, seeking further compliance with the prior order. A second hearing to enforce compliance was held on July 11, 1988, and additional information was produced by the district attorney, again excluding the Oglesby statement. According to the opinion of the trial court, the district attorney gave "repeated assurances" that all available evidence had been provided.

On August 17, 1988, the first day of trial, the district attorney informed the trial court that he had procured a statement from Oglesby on April 5, 1988, and intended to call Oglesby as a witness. Defense counsel moved for a continuance and/or sanctions. However, when the court decided to grant the continuance, the district attorney agreed to accept sanctions in exchange for proceeding with the trial. To that end, he was informed that he could not use the statement of Oglesby. The colloquy was as follows:

THE COURT: We're going to grant the request for the continuance to the October 1988 term of criminal court because of the—to allow the defense an opportunity to meet, to have an expert look at the diagram alleged to have been drawn by Mr. Moose, and also to deal with statements in the Oglesby statement.

MR. REBERT: May I then request that those offers of proof be withdrawn by the Commonwealth and represent to the Court that we will not use them?

THE COURT: You will not use anything in the Oglesby statement or the diagram?

MR. REBERT: Yes, sir.

THE COURT: So you would agree then to in effect a sanction about—about their non-use?

MR. REBERT: Yes, sir.

THE COURT: Mr. Smith, that's what you're requesting, a sanction. So the DA's saying he won't use it.

In the Commonwealth's case in chief, Detective Castellano testified about a statement that Moose had made when he had been arrested. In that statement, Moose denied ever raping the victim or beating her, but stated that he was present when Quinterio Smart raped her.

Moose testified on his own behalf and stated that although he was with Quinterio Smart when Smart raped Miss Ketterman repeatedly, Moose was very intoxicated and never touched the woman. Moose also testified that he ran away when he saw Smart starting to beat Ms. Ketterman.

The trial judge permitted Oglesby to testify on rebuttal, over defense counsel's objection. Oglesby testified that while he was alone with Moose, Moose told him that he had raped the victim and had hit her in the head with a rock.

On re-rebuttal, Moose testified that he had never spoken to Oglesby about the case. Moose was convicted of first degree murder, and conspiracy to commit murder, rape and conspiracy to commit rape and was sentenced to life imprisonment plus a 15 to 30 year consecutive sentence.

Following the trial, counsel for appellee filed post trial motions and moved for an evidentiary hearing in support of such motions. At that hearing, the district attorney testified his office had "an implied understanding" with Sonny Oglesby whereby Oglesby would inform the district attorney's office about statements allegedly made by people in the jail awaiting trial:

Q. Did the personnel at the York County Prison, the officers, the Warden, did they know that Mr. Oglesby was working for the District Attorney's Office in getting information for them concerning these other cases?

224

A. He was not working for the District Attorney's Office.

Q. Well what would you call it if he was down there on your purposes, for purposes of getting information, not being sentenced and kept there so he could get data for you. What would you call that?

A. That's your conclusion, Mr. Smith.

Q. How would you determine it?

A. He was never directed to work for the District Attorney's Office.

Q. But there was an implied understanding that he was, isn't this true? It may not be directed. There was an implied understanding between Oglesby and the District Attorney's Office he was to help you folks in any major criminal case that he could?

A. That may be your understanding.

Q. Is it true or isn't it true?

A. Well, I can't answer that. *There was an implied understanding.* There was no specific understanding. There was no direction that he do that. That's all I can say.

Q. He knew he wasn't being sentenced on crimes that occurred in '85. He wasn't pushing for sentencing and you weren't pushing for sentencing and he was being kept down there for your advantage?

A. Yes.

Q. What was that advantage?

A. Well, he was gathering information for us but not at my direction. He was there. And people were talking to him.

Q. And you liked that, did you not?

A. Yes, sir, I did.

Q. *And that's why you kept him there?*

A. *I think that's fair to say, yes, sir.*

(emphasis supplied).

During trial, Oglesby did not testify about any such understanding. In his post-trial motions, Moose contended

that the district attorney's "understanding" with Oglesby had deprived Moose of his Sixth Amendment right to counsel. In its opinion on Moose's post-trial motions, the trial court, although stating that "we do not condone nor encourage the behavior exhibited by the district attorney," ruled that a new trial was not warranted.

The Superior Court reversed the conviction, 393 Pa.Super. 379, 574 A.2d 661, holding that: (1) the actions of the Commonwealth served to deprive appellee of his Sixth Amendment right to counsel; (2) the failure of the Commonwealth to reveal its implied understanding with Oglesby violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and required a new trial; and (3) the failure of the Commonwealth to comply with the rules of discovery also required reversal.

In its appeal, the Commonwealth raises three issues: namely, (1) whether the Commonwealth had an agreement with Sonny Oglesby for him to solicit and obtain incriminating evidence; (2) whether the Commonwealth deprived appellant of a fair trial by failing to disclose to counsel any implied understanding between the Commonwealth and Oglesby; and (3) whether the admission of Oglesby's statement was, in any event, harmless error beyond a reasonable doubt. This Court granted the Commonwealth's petition for allowance of appeal to resolve these questions. We now affirm.

## DISCUSSION

### I. *Sixth Amendment Violation* [1]

Over the last twenty five years, the United States Supreme Court has on more than one occasion addressed the admissibility of statements surreptitiously obtained by

---

**1.** As the parties have not raised any of the issues before the Court under the Pennsylvania Constitution and as federal constitutional issues are dispositive, we do not address whether our state constitution would provide more protection than its federal counterpart. See, *Commonwealth v. Karash,* 513 Pa. 6, 8 n. 1, 518 A.2d 537, 538 n. 1 (1986); *Wiegand v. Wiegand,* 461 Pa. 482, 337 A.2d 256 (1975).

government agents after the right to counsel has attached. In 1964, the United States Supreme Court in *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), reaffirmed the New York state rule that "[a]ny secret interrogation of the defendant, from and after the finding of the indictment, without the protection of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime." *Id.* at 205, 84 S.Ct. at 1202, quoting *People v. Waterman,* 9 N.Y.2d 561, 565, 175 N.E.2d 445, 448, 216 N.Y.S.2d 70, 75 (1961).

In *Massiah,* the defendant, while free on bail, had a conversation in the absence of counsel with one of his co-defendants, while sitting in the co-defendant's automobile. Unbeknownst to Massiah, the co-defendant was cooperating with the government and had installed a radio transmitter in the automobile, recording the conversation. The Supreme Court held that such actions denied Massiah his Sixth Amendment right to counsel and the recorded statements could not be used by the prosecution as evidence against Massiah at trial. "We hold that petitioner was denied the basic protections of that [Sixth Amendment] guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had *deliberately elicited* from him after he had been indicted and in the absence of his counsel." 377 U.S. at 206, 84 S.Ct. at 1203 (emphasis supplied).

The rule of *Massiah* was reaffirmed in *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). In *Henry,* government agents contacted an inmate confined to the same cellblock as the defendant and requested him to alert them to any statements made by federal prisoners. The inmate was told not to initiate any conversations with the defendant Henry about the bank robbery for which Henry had been indicted and for which he was in jail awaiting trial. The informant, Nichols, reported to the government that Henry told him about the robbery in question. Nichols was paid for his report. During the

trial, Nichols testified against Henry, who was convicted of the crime.

Chief Justice Burger, writing for the Court in *Henry*, concluded that the government had "deliberately elicited" incriminating statements from Henry within the meaning of *Massiah*. The Court deemed three factors to be significant. First, Nichols was acting under instructions as a paid informant for the government. Second, Nichols was ostensibly no more than a fellow inmate. Third, Henry was in custody and under indictment. The Court noted that "[e]ven if the agent's statement that he did not intend that Nichols would take affirmative steps to secure incriminating information is accepted; he must have known that such propinquity likely would lead to that result." 447 U.S. at 271, 100 S.Ct. at 2187.

The Supreme Court rejected the government's contention that a less rigorous standard under the Sixth Amendment should be applied when an accused is speaking to an undercover informant rather than known government officers. The Court quoted *Massiah* in remarking that "if the Sixth Amendment 'is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse.'" 447 U.S. at 273, 100 S.Ct. at 2188, quoting *Massiah*, 377 U.S. at 206, 84 S.Ct. at 1203.

After making these observations, the Court in *Henry* held that "[b]y intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel." 447 U.S. at 274, 100 S.Ct. at 2189.

The *Henry* rule was thereafter applied by the Supreme Court in *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). In *Moulton*, the defendant and a co-defendant, Colson, were charged with theft by receiving automotive vehicles and parts. Before their trial, Colson agreed to plead guilty and cooperate with the government. He was equipped with a body wire and recorded a meeting with Moulton concerning the crime for which they were to

stand trial. Although Colson was instructed not to attempt to question Moulton at the meeting, his remarks in fact caused Moulton to make incriminating statements. Some of these statements were admitted into evidence and Moulton was convicted of some of the charges. The Supreme Judicial Court of Maine reversed and remanded for a new trial. The United States Supreme Court affirmed, holding that the conduct of the government violated the defendant's Sixth Amendment right to counsel. The Court explained that since the Sixth Amendment guarantees the accused, after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State, then there is also an affirmative obligation not to act in a manner that circumvents the protections accorded the accused. As such, the Supreme Court held that the "Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." 474 U.S. at 176, 106 S.Ct. at 487.

In the case *sub judice,* we note that at the time Oglesby claimed to have spoken with Moose, Moose's Sixth Amendment right to counsel had attached. Moose had been charged with a crime and was in custody. As we stated in *Commonwealth v. Karash,* 513 Pa. 6, 518 A.2d 537 (1986), "[t]he triggering event for Sixth Amendment rights to attach is the commencement of adversary judicial proceedings against the defendant." *Id.* at 12–13, 518 A.2d at 541. *See also, Commonwealth v. Santiago,* 528 Pa. 516, 599 A.2d 200 (1991). *Cf. Illinois v. Perkins,* 496 U.S. 292, 110 S.Ct. 2394, 2398–99, 110 L.Ed.2d 243 (1990). Accordingly, the *Massiah, Henry* and *Moulton* decisions are applicable to the instant matter. The next and more difficult step in our inquiry is determining whether the Commonwealth "deliberately elicited" incriminating statements from Moose through Oglesby.

As Justice Brennan noted in *Moulton,* "[d]irect proof of the State's knowledge will seldom be available to the accused." 474 U.S. at 176 n. 12, 106 S.Ct. at 487 n. 12.

However, proof that "the State 'must have known' that its agent was likely to obtain incriminating statements from the accused in the absence of counsel suffices to establish a Sixth Amendment right." *Id.*, quoting *Henry*, 447 U.S. at 271, 100 S.Ct. at 2187.

In the instant case, the district attorney testified that Oglesby had been kept in the county jail for three years because he was supplying the district attorney's office with information about various inmates. In fact, during Moose's trial, the district attorney stated that Oglesby was called the "monsignor" because so many inmates allegedly confessed to him.

Although the district attorney denied that he instructed Oglesby to gather information, it is clear from the testimony that Oglesby was acting as an agent of the Commonwealth when he was in jail. Oglesby had been in the county jail for three years waiting to be sentenced; the Commonwealth repeatedly delayed sentencing every time Oglesby produced a new confession. Although the district attorney may have not given Oglesby specific instructions, it is clear that Oglesby was well aware of what he had to do while in jail to get a good recommendation at his sentencing.

It is not significant that Oglesby was not planted for the purpose of gaining information from a targeted defendant. The fact that the Commonwealth intentionally left him there to harvest information from anyone charged with a crime and awaiting trial is the villainy. The vast majority of people in county jail are charged with crimes and awaiting trial and they have a right to counsel when interrogated about the crimes with which they are charged.

While the government may not have paid Oglesby with money, they were prepared to pay him as valuable a coin: a lenient recommendation despite the heinous charges filed against him.[2] We are thus persuaded and conclude that

2. The district attorney testified in the post-trial hearing that he would make Oglesby's cooperation known to the court at the time of Mr. Oglesby's sentencing. Furthermore, after Mr. Oglesby was arrested for murder, the district attorney entered into a plea agreement where-

Oglesby was an agent for the Commonwealth. He "elicited" a confession from Bradley Small inculpating Small's brother and when that turned out not to be the person the Commonwealth charged, Oglesby went right back to the prison and "elicited" a confession from Moose (who denied making any such confession to Oglesby).

The Commonwealth apparently lost sight of the fact that "ours is an accusatorial and not an inquisitorial system" of justice, *Rogers v. Richmond,* 365 U.S. 534, 541, 81 S.Ct. 735, 739, 5 L.Ed.2d 760 (1961), and that "tactics for eliciting inculpatory statements must fall within the broad constitutional boundaries imposed by the Fourteenth Amendment's guarantee of fundamental fairness." *Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985), quoted in *Illinois v. Perkins,* 496 U.S. 292, 110 S.Ct. 2394, 2399–2400, 110 L.Ed.2d 243 (1990) (Brennan, J., concurring).

We are careful to note that this situation is distinguishable from the case in which an inmate unexpectedly comes forward with incriminating information about a fellow inmate. *See, e.g., Commonwealth v. Berkheimer,* 505 Pa. 506, 481 A.2d 851 (1984) or where an informant is a passive listener to a heartfelt confession. *See, e.g., Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986). In his recorded statement of April 5, 1988, Oglesby admitted that he asked Moose whose knife it was (that killed Miss Ketterman) and related other questions designed to elicit incriminating information. We believe that the facts of this case fall squarely within the prohibition of *Moulton;* the "Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." *Moulton,* 474 U.S. at 176, 106 S.Ct. at 487.

We are thus convinced that the Commonwealth knowingly circumvented Moose's Sixth Amendment right to counsel and hold that a new trial is required.

by they would accept the plea of guilty to third degree murder in return for Oglesby's full cooperation. That plea agreement pre-dated the events in this case.

## II. *Failure to Disclose Exculpatory Information*

The Superior Court held that the failure of the Commonwealth to disclose their "understanding" with Oglesby constituted a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which requires a prosecutor to turn over to the defense all material evidence tending to exculpate the defendant.

In the instant case, Oglesby testified that Moose stated that he had hit the victim with a rock and raped her. Thus, Oglesby's testimony was significant and his credibility an important factor in the trial of this case. The appellee argued, and the Superior Court agreed, that any "agreement" or "understanding" the prosecution had with Oglesby was material and should have been disclosed to the defense.

The appellee's discovery request sought the existence of any statements made by the defendant or witnesses— whether inculpatory or exculpatory. Additionally, the appellee requested "[a]ny other evidence that the Commonwealth has obtained that would be exculpatory or inculpatory to either of the Defendants, Carlos Gene Moose, Jr., or Quinterio Smart." This request is what has been termed a "general request" for exculpatory evidence. *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

It is clear that the Commonwealth did not disclose Oglesby's identity or statement until the day of trial in violation of Pa.R.Crim.P. Rule 305 B (*See* Part III, *infra*). Additionally, the Commonwealth did not disclose that it had an "understanding" with Oglesby until *after* Oglesby had testified and the appellee had been convicted. The question we must now grapple with is whether such deliberate nondisclosure constituted a violation of *Brady* and its progeny.

In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held "that suppression by the prosecutor of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irre-

spective of the good faith or bad faith of the prosecution."
*Id.* at 87, 83 S.Ct. at 1196.[3] Furthermore, "[w]hen the
'reliability of a given witness may well be determinative of
guilt or innocence,' nondisclosure of evidence affecting cred-
ibility falls within this general rule." *Giglio v. United
States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104
(1972), quoting *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct.
1173, 1177, 3 L.Ed.2d 1217 (1959).

In *Commonwealth v. Wallace*, 500 Pa. 270, 455 A.2d
1187 (1983), Justice Larsen, writing for the Court, held that
the failure of the Commonwealth to comply with Rule 305 B
and disclose the name and criminal record of the Common-
wealth's star witness, as well as the failure of the Common-
wealth to correct his false testimony constituted a clear
violation of the *Brady* doctrine. In *Wallace*, the prosecu-
tion did not disclose the name or identity of Olen Clay
Gorby, the key witness. Following a mistrial, a second jury
was convened and although Gorby was identified, the prose-
cution let Gorby testify falsely about his criminal back-
ground, without benefit of correction by the District Attor-
ney's office. We held in *Wallace* that the unilateral deter-
mination by the Commonwealth not to disclose Gorby's
criminal record was error.[4]

3. In *Brady*, the defendant had asked to see statements of the co-
defendant. Although several statements were shown to him, one
statement, in which the co-defendant admitted the actual homicide,
was withheld by the prosecution and was not discovered until after
Brady's conviction and the appeal affirming the conviction. Thus,
Brady involved a *specific* request. As the *Agurs* Court stated: "When
the prosecutor receives a specific and relevant request, the failure to
make any response is seldom, if ever, excusable." 427 U.S. at 107, 96
S.Ct. at 2399. Additionally, where the request is specific, evidence is
material if it "might have affected the outcome of the trial." 427 U.S.
at 104, 96 S.Ct. at 2398. As more fully explained *infra*, the standard of
materiality is different in a case where a specific request is made as
opposed to where a general request is made.

4. In *Wallace*, the Court remarked that they were not addressing the
situation "where no specific request is made for particular exculpatory
evidence, but the prosecution knows, or has reason to believe, that he
possesses information or evidence that would tend to exculpate a
defendant." 500 Pa. at 276, n. 3, 455 A.2d at 1190, n. 3. This is the
situation that we address herein. *See also, Commonwealth v. Rose,*

 In addressing *Brady* issues, we are mindful of certain principles. First, in line with *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), there is an obligation of counsel to make a specific request for exculpatory evidence. If the request is not specific, then the evidence must clearly be material in order for the Commonwealth to be required to disclose it. "The test of materiality in a case like *Brady* in which specific information has been requested by the defense is not necessarily the same as in a case in which no such request has been made." 427 U.S. at 106, 96 S.Ct. at 2398. In a case where the request is specific, the test of materiality is whether the evidence "might have affected the outcome of the trial." *Agurs,* 427 U.S. at 104, 96 S.Ct. at 2398. Where the request is general, rather than specific, as in the case *sub judice,* evidence is material "if the omitted evidence creates a reasonable doubt that did not otherwise exist...." 427 U.S. at 112, 96 S.Ct. at 2402. We believe that a witness' apparent motivation is relevant. When that witness was a *significant witness* for the Commonwealth, who testified that Moose claimed he raped the victim and hit her with a rock, his motivation for testifying was crucial and hence, material. It "creates a reasonable doubt that did not otherwise exist." *Id.* As we stated in *Wallace:*

> The major focus of the defense was upon the credibility of the Commonwealth's "star" witness, Olen Clay Gorby. (Indeed, no other defense was offered.) Had the jury been completely apprised of Gorby's cooperation and undercover activities with law-enforcement agencies, his three month release from the Washington County Jail while working as an undercover agent for the federal authorities, the fact that he had shot at the owner and his son at the Village Green golf course, the fact that he had not pled guilty to eleven counts of burglary which were hanging over his head, and his entire criminal record, the jury could easily and legitimately have inferred that *Mr.*

483 Pa. 382, 396 A.2d 1221 (1979); *Commonwealth v. Stickle,* 484 Pa. 89, 398 A.2d 957 (1979).

> *Gorby was less motivated by truth or by altruistic motives of truth and sympathy for the homicide victims than by a sincere desire to do "whatever-it-takes" to secure an early release and lenient sentences for his nefarious and numerous crimes.*

500 Pa. at 280, 455 A.2d at 1192–93 (emphasis supplied). This same motivation may well have been present in the case *sub judice.*[5]

The second principle we are concerned with is a defendant's ability to ask for exculpatory evidence of which he is not aware. In the case before us, Moose never made a request for the criminal records of any government witnesses, nor did he request information about any promises, inducements, rewards or agreements between the witnesses and the Commonwealth.[6] However, Moose's failure to seek such information is directly traceable to the failure of the district attorney in this case—like the district attorney in the original trial in *Wallace*—to identify Oglesby. Had the Commonwealth provided the appellee with Oglesby's name, Moose would then have had the opportunity to seek further information about Oglesby. Thus, in the case before us, the failure of the Commonwealth to disclose the identity of Oglesby as a witness impermissibly interfered with the Moose's ability to seek information concerning Oglesby's understanding with the Commonwealth.

5. We note that in the instant case, defense counsel asked Oglesby what he had said to the prosecutor about testifying in this trial. Oglesby replied: "Into that regard I said I have come forth to testify to the truth. I have seen others testify to the truth. I did not ask to leave incarceration. I said I would only like to know when am I being sentenced and how much time I was getting myself. It [speaking with the prosecutor] had nothing to do with me not testifying at all."

6. We note that in *Wallace,* the defendant had made a specific request for exculpatory evidence. Additionally, the Court found that Wallace's conviction was achieved through the use of "materially false or perjured testimony." As such, a "strict standard of materiality" was employed. While the standard of materiality is lessened in a case where there is a general request or no request, we believe that in this case, the standard of materiality was met, as more fully set out *supra* at page 233.

Thus, for the foregoing reasons, we conclude that the prosecutor's failure to identify Oglesby and disclose its "understanding" with him constitutes a violation of *Brady* and requires a new trial.

## III. *Violation of Rule 305 B*

[5] The Superior Court also determined that the failure of the prosecutor to turn over Oglesby's statement to the defense violated of Rule 305 B of the Pennsylvania Rules of Criminal Procedure and required a new trial. We agree.

Rule 305 B, entitled "Disclosure by the Commonwealth" provides, in pertinent part:

(1) *Mandatory.* In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.

b) any written confession or inculpatory statement, or the substance of any oral confession or inculpatory statement, and the identity of the person to whom the confession or inculpatory statement was made, which is in the possession or control of the attorney for the Commonwealth.

The district attorney obtained the statement on or about April 5, 1988. Trial did not begin until August 17, 1988. Between April 5 and August 17, 1988, the district attorney appeared twice in court on discovery matters and never informed the court or defense counsel of the existence of this statement—despite a specific request for such statements made by the defense. The district attorney's failure to inform defense counsel of the statement was a willful violation of Rule 305 B. *See Commonwealth v. Rodgers,* 500 Pa. 405, 456 A.2d 1352 (1983). As the trial judge remarked in his post-trial opinion, during the second hearing to enforce compliance with the request for discovery,

"[t]he district attorney gave repeated assurances that all available evidence had been provided." [7] The district attorney's assurances were false.[8]

■ In essence, what the district attorney appears to have attempted to do was to try his case with last minute disclosures. Such a plan was fundamentally unfair and violated the discovery rules. The purpose of the discovery rules is to permit the parties in a criminal matter to be prepared for trial. Trial by ambush is contrary to the spirit and letter of those rules and cannot be condoned. We agree with the statement of the Superior Court in a similar instance, remarking that "[o]ur court has condemned such gamesmanship in criminal prosecutions." *Commonwealth v. Thiel*, 323 Pa.Super. 92, 100, 470 A.2d 145, 149 (1983). In *Thiel*, the Commonwealth "left the [evidence] conspicuously out of its short pretrial list of tangible evidence in its possession, and used the [evidence] skillfully in rebuttal." *Id. See also* Comment to Rule 305.

In this case, the trial judge, pursuant to Rule 305 E of the Rules of Criminal Procedure, properly ordered a continuance of the trial.[9] The district attorney, however, promised not to use the statement. Defense counsel was satisfied with the agreement not to use the statement and the trial

**7.** Defense counsel also challenged the propriety of the district attorney's last minute disclosure of other items, including the complete content of the James Phillips statement, the diagram of the crime scene allegedly drawn by Moose, and certain laboratory reports and photographs. The timeliness of those disclosures, however, has not been addressed by the parties in this appeal and thus need not be considered.

**8.** The district attorney's conduct raises significant ethical concerns. *See* Pennsylvania Rule of Professional Conduct 3.3(a)(1) ("A lawyer shall not knowingly ... make a false statement of material fact ... to a tribunal.").

**9.** Rule 305 E provides:
 If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit discovery or inspection, may grant a continuance, or may prohibit such party from introducing evidence not disclosed, other than testimony of the defendant, or it may enter such other order as it deems just under the circumstance.

proceeded as scheduled. Then, when the district attorney sought to use the statement in rebuttal, the trial judge granted the request.

The actions of the trial judge in this instance are rather inexplicable, as he indicated during the colloquy about the rebuttal evidence that he had excluded the evidence. (*See infra* excerpts of testimony). The judge's decision to reverse himself without explanation during the middle of trial constituted an abuse of discretion.

■ What is particularly harmful about this case is that the appellee evidently relied upon the agreement not to use the statement of Oglesby. In fact, defense counsel stated during a conference with the judge at the commencement of trial that he did not need a copy of the statement, since Oglesby would not be testifying. Furthermore, in reliance upon the agreement that the statement would not be used, the appellee took the stand—unaware of the precise content of Oglesby's statement and certainly not knowing that it would be used to impeach him. This reasonable reliance on the statements of the district attorney and the prior ruling of the trial court deprived the appellee of due process of law. Once the district attorney stated unconditionally that he would not use the statement and the trial court permitted the trial to proceed on that basis, it was fair to assume the statement was not to be used for any purpose, including rebuttal. "Discovery decisions ... recognize that the Commonwealth's failure to disclose possible impeachment or rebuttal evidence may highly prejudice the defendant's case and lead to reversible error when the evidence is sprung on the defendant unawares." *Thiel*, 323 Pa.Super. at 99, 470 A.2d at 149 (1983). We believe that unless a new trial is granted, we would be condoning and encouraging such last minute disclosures and gamesmanship.[10]

10. We are guided in this case by *Commonwealth v. Jenkins*, 476 Pa. 467, 383 A.2d 195 (1978), where the prosecutor denied the existence of an impeaching statement and then introduced it, over defense objection, during rebuttal. The *Jenkins* Court found that it was error to admit the statement because of the critical effect it had on the appellant's credibility. The trial court in the instant case distin-

238

Thus, for the foregoing reasons, we hold that the trial court abused its discretion in permitting Oglesby to testify on rebuttal, and a new trial is required.

The Commonwealth has raised two other matters which we must address.

## IV. *Waiver and Harmless Error*

The Commonwealth further challenges the opinion of the Superior Court on the grounds that: (1) the appellee waived the issue of admission of Oglesby's statement; and (2) the admission of the statement was harmless error.

■ We do not agree that the appellee waived the issue. The following occurred at the time Mr. Rebert sought to introduce the Oglesby testimony:

Mr. Rebert: Your Honor, in light of the defendant's having testified, I would offer in rebuttal the statement of Sunny Oglesby that was the subject of our conference concerning discovery.

If you will recall, this is the statement that was denied me by the Court because it was not physically given to counsel until last Wednesday when the trial began, when in fact, it had been taken from Mr. Oglesby on April 5, 1988. The prior inconsistent aspect of it is that the Defendant admitted to him that he was involved in the rape and I think he also admitted that he struck the victim.

guished *Jenkins* on the grounds that Moose was offered a two day recess to prepare. Once the judge determined that Oglesby could testify, it did not matter that a continuance was offered. A continuance of a day, a week, or six weeks would not have made the rebuttal testimony less damaging. Once the appellee had testified, and the decision to admit the rebuttal testimony was made, the prejudice was created and would not be lessened with a continuance. As we noted in *Jenkins,* when a defendant is impeached with his own confession, the jury's appraisal of the defendant's credibility weighs heavily. "The Supreme Court has long rejected the notion that credibility is unrelated to a fact-finder's final decision to acquit or convict." *Id.,* 476 Pa. at 470, 383 A.2d at 196. *See also Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

Mr. Smith: Well, Judge, *I've never seen this statement,* I have no chance to interview witnesses to find out who else was down at the jail when this happened. Mr. Rebert had discovery information from me three, four months before this trial began, asking for any and all statements. He's had this since April of '88, and I've never seen it and I think it's highly unfair.

Mr. Rebert: Your Honor, that was all covered at the beginning of the trial. I offered this, physically offered this statement to Mr. Smith even after the Court's ruling, and he refused to take it.

Mr. Rebert [sic]: *No, the Judge said it was not going to be used, I believe.*

The Court: *Right, I said it wasn't.* Do you have a copy now you can give him? All right. There's a copy for you.

Mr. Smith: I'm going to take a strong exception to this, Judge.

The Court: You objection—

Mr. Smith: To the fact he's going to use him as a rebuttal witness, my getting this statement at the 11th hour.

The Court: *We note your objection on the record* (emphasis supplied).

Clearly, Moose made a proper objection and preserved the issue before the trial court. Although Moose later withdrew his request for a two-day continuance so as to accommodate the jury, his initial objection was not vitiated. Accordingly, the Commonwealth's claim is without merit.

■ We similarly disagree with the Commonwealth's argument that the error, if any, in admitting Oglesby statement was harmless. Oglesby's testimony was extremely damaging since he testified that Moose admitted to having sex with the victim and hitting her with a rock. The Commonwealth has clearly failed to meet its burden of proving "beyond a reasonable doubt that the error could not have contributed to the verdict." *Commonwealth v. Story,*

476 Pa. 391, 412, 383 A.2d 155, 166 (1978); *Commonwealth v. Bricker*, 525 Pa. 362, 581 A.2d 147 (1990).[11]

For all of the foregoing reasons, we affirm the decision of the Superior Court vacating the appellee's sentence and remanding for a new trial in accordance with this opinion.[12]

McDERMOTT, J., files a concurring opinion.

McDERMOTT, Justice, concurring.

I concur in the decision of the majority on the grounds that the activity of the Commonwealth in this case was violative of the Pennsylvania Rules of Criminal Procedure, specifically Rule 305 B. Given this basis for a new trial there is no need to reach the constitutional issue discussed by the majority. However, since the majority has chosen to resolve this issue on the high ground, I must note that the

11. In his concurring opinion, Mr. Justice McDermott remarks (1) that there was no need to reach the constitutional issue and that (2) this opinion should not be read as precluding the statement of Oglesby in rebuttal during the retrial. In response, we are compelled to state that principles of judicial economy encouraged us to reach the issue of whether Moose's Sixth Amendment rights were violated by the method used by the Commonwealth in obtaining the statement of Oglesby. We have reversed this case and remanded it for a new trial. As such, we believe that it is appropriate to reach the Sixth Amendment issue in order to determine whether that statement may be used in the prosecution's case-in-chief. Our resolution of the Sixth Amendment question answers that question in the negative. We believe it would be imprudent of us to skip over that issue and possibly be faced with it again, should Moose be convicted following retrial. The issue was raised, preserved and addressed by the courts below. We will only confuse the lower courts if we do not answer this question now.

We have expressed no opinion as to whether Oglesby's statement may be used in rebuttal; the parties have not raised the issue and the courts below have not addressed it. Additionally, we are mindful of the fact that should the prosecutor attempt to use this statement in rebuttal, it is incumbent on the trial court to determine whether the statement was voluntary. As stated in Article I, Section 9, "[t]he use of a suppressed *voluntary* admission or *voluntary* confession to impeach the credibility of a person may be permitted and shall not be construed as compelling a person to give evidence against himself." (emphasis supplied). The parties have not addressed the issue of voluntariness and we express no opinion thereon.

12. Because of our deep concern over the conduct of the Commonwealth in this instance, this matter is hereby referred to the Disciplinary Board for its consideration.

fact that the statement will be inadmissible in the Commonwealth's case in chief should not be interpreted as precluding its use as authorized by Article I, Section 9 of the Pennsylvania Constitution. Article I, Section 9 of the Pennsylvania Constitution provides in relevant part: "The use of a suppressed voluntary admission or voluntary confession to impeach the credibility of a person may be permitted." On this point I am compelled to comment that the majority's attempted insertion of an issue as to the voluntariness of appellee's admission is truly factitious; since appellee denies ever making the statements at issue he cannot be heard to say "I made it, but it was involuntary." Thus if, on retrial, Mr. Moose takes the stand and denies his involvement, the Commonwealth should be entitled to introduce its evidence which contradicts that statement, whatever its probative weight.