J-S05011-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANDREW HOLDER | : | |
| | : | |
| Appellant | : | No. 891 EDA 2020 |

Appeal from the Judgment of Sentence Entered February 12, 2020
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0004884-2017

BEFORE: BOWES, J., LAZARUS, J., and McLAUGHLIN, J.

MEMORANDUM BY BOWES, J.:                      **FILED MAY 25, 2021**

Andrew Holder appeals from the judgment of sentence of seventeen and one-half to thirty-five years of imprisonment imposed following non-jury convictions of third-degree murder, burglary, and conspiracy. We affirm.

The trial court offered the following detailed summary of the underlying facts established at Appellant's trial:

> On the evening of January 3, 2017, Marcella Vance watched movies with her cousin, Jessica Kidd, and her paramour, the decedent Darryl "Kwan" Curtis, in the back room of her apartment located at 8029 Erdrick Street in Northeast Philadelphia. Vance shared the apartment with her roommate Nashieta Noland, who was present in the front room with her paramour, the codefendant Jamal Washington. At approximately 8:30 p.m., Vance left the apartment to drive Kidd home. Shortly thereafter, both Noland and Washington left the apartment, leaving the decedent alone inside.
>
> Between 7:52 p.m. and 8:24 p.m., Washington received multiple phone calls from and individual named Robert Thorogood and [Appellant]. At 8:24 p.m., Washington called [Appellant].

[Appellant], who was wearing a global position-tracking electronic monitor while under the supervision of the Pennsylvania State Parole Board, travelled to the area of 8029 Erdrick Street. There, he and an unidentified individual met Washington, and all three walked in the direction of the apartment, which [Appellant] entered at 9:35 p.m., armed with a pistol. Inside, [Appellant] searched a safe inside Noland's room and encountered the decedent inside Vance's bedroom. There, he shot and killed the decedent.

Detective Thorsten Lucke, an expert in both video surveillance recovery and cell phone data extraction, recovered video surveillance recordings from private residences at 8052 and 8045 Erdrick Streets, along with video recorded from a church located at the corner of W[e]lsh and Erdrick Streets. Surveillance footage recovered from the corner of Erdrick and W[e]lsh Streets depicted two vehicles make a left-hand turn from W[e]lsh Street onto Erdrick, in the direction of the apartment. The camera located at 8052 Erdrick Street captured video of [Appellant], Washington, and another individual walking down Erdrick Street at 9:32 p.m. towards the decedent's location, before disappearing from view. At 9:34 p.m., the cameras at 8052 Erdrick Street recorded . . . Washington speaking on a cellular device while walking back towards Welsh Street, away from the crime scene. At 9:38 p.m., both cameras captured [Appellant], armed with a pistol, running away from the murder scene with the unidentified individual, with an object consistent with a backpack seen carried in the frame. [Appellant]'s positive identity was captured as he ran past the camera located at 8052 Erdrick Street at 9:39 p.m.

Vance, who had dropped Kidd off at her home before purchasing dinner and cigarettes at other locations, called the decedent at 9:48 p.m. but received no response. Upon entering the apartment less than fifteen minutes later, Vance discovered the decedent's body lying in a pool of blood in the back bedroom. After attempting to give CPR, both Vance and her upstairs neighbors called 911. Philadelphia Police Sergeant Conway and Officer Theodore Brown answered a radio call for an unresponsive male and discovered the decedent's body on location. The decedent was pronounced dead at the scene at 10:19 p.m.

Forensic pathologist Dr. Lindsay Simon performed the decedent's autopsy and determined that the cause of death was a single gunshot wound to the head, and the manner of death was

homicide. The projectile entered the decedent's head above the right eyebrow, traveled through his skull and brain, before exiting behind the left ear, causing immediate incapacitation and death. There was no soot or stippling discovered on the body to determine the distance of the shooter.

After calling the police, Vance called Noland, described the bloody crime scene, and asked her to return to the apartment. Washington also returned to the apartment upon Noland's request. All three spoke to detectives at the scene and traveled to the Police Administration Building where they each provided statements, and Washington surrendered his cell phone for further investigation.

Officer Brown inspected the apartment and observed misplaced items in Noland's bedroom, including a gun-cleaning kit and boxes of unfired projectiles, but did not find any signs of forced entry. At 1:10 a.m. on December 4, 201[7], Officer Brian Stark of the Crime Scene Unit arrived at the location and recovered forty-nine bullets of different brands that had been previously stored in Vance's safe. A fired projectile was discovered inside a dresser drawer in Vance's bedroom, demonstrating that the projectile was fired inside the room. Officer Stark also recovered five latent fingerprints from the crime scene, which he submitted for review. Patrick Raytek, a forensic scientist with the police department's latent print unit, examined all five latent prints and determined that a print lifted from the ammunition box matched [Appellant].

On the morning [after the shooting], Vance returned to the apartment and discovered a fired cartridge casing ("FCC") on the floor between her bed and nightstand. Vance further noticed that the decedent's backpack, which usually contained valuable coins, comic books and possibly narcotics, was missing from her bedroom. After contacting the police, she returned to the Police Administration Building and provided a second statement, wherein she explained that her ex-husband, Stacy Strange, previously kept a firearm in the searched safe, but that the firearm had been removed from the home prior to the shooting. She further noted that the safe did not contain valuables.

Later that morning, [Appellant]'s State Parole Officer . . . Jacqueline Vaughn discovered an email alerting her that the battery charge of [Appellant's] GPS ankle monitor had fallen below

- 3 -

the alert threshold at 8:51 p.m. on the night of the shooting and went into violation at 9:21 p.m. for failure to charge the device. Because the monitor was in violation, it recorded [Appellant's] location every fifteen seconds. Vaughn cross-referenced the GPS information with a map of the city. Her analysis demonstrated that, starting at 9:00 p.m., [Appellant] traveled from Wissahickon Avenue and onto Roosevelt Boulevard, towards the crime scene. GPS records further revealed that [Appellant] arrived on Erdrick Street at 9:32 p.m., and remained until 9:44 p.m. The GPS monitor tracked [Appellant]'s location as he returned home between 9:44 p.m. and 10:11 p.m., whereupon he began charging the device above the alert threshold.

The next day, Vaughn watched a news program reporting the decedent[']s murder in his apartment on Erdrick Street. After reviewing her report showing [Appellant] at the location at the time of the shooting, Vaughn contacted homicide detectives.

David Webb, an account manager with Attendi Electronic Monitoring, the company that manufactures and stores records for [Appellant]'s GPS monitor, reviewed the data associated with [Appellant]'s device from the night of the murder. In his analysis, Webb noted that, while the device can pinpoint a user's location to within a ten foot range of accuracy, movement of that device, or interference by entering a building, can decrease that range of accuracy to an inconclusive level of 100 feet.

GPS location records kept in the course of ordinary business demonstrated that at 9:31:35 p.m., [Appellant]'s device recorded his location at 8077 Erdrick Street. At 9:32:35 p.m., [Appellant] was walking outside 8068 Erdrick Street, towards the decedent's location at 8029 Erdrick Street at a speed of three miles per hour. [Appellant] continued past 8054 Erdrick Street before reaching 8025 Erdrick Street at 9:34:35 p.m. At 8025 Erdrick Street, the device's range of accuracy decreased to fifty-six feet, indicating that [Appellant] was inside a building. Between 9:35:38 p.m. and 9:37:35 p.m., the device identified [Appellant]'s location at 8029 Erdrick Street, with decreasing ranges of accuracy from seventy-nine feet, to ninety-three feet, and ultimately reaching inconclusive levels beyond 100 feet, demonstrating his presence inside a building. By 9:40 p.m., the device began recording [Appellant]'s location moving away from 8029 Erdrick Street with increasing levels of accuracy, before being plugged in at 10:11 p.m., and coming to rest at 11:57 p.m.

Detective Lucke completed a call detail record report on the cellular device attributed to Washington on June 7, 2017, which revealed a series of phone calls between his device and those attributed to [Appellant] and Thorogood. At 7:53 p.m., Thorogood placed a call to Washington, lasting fifteen seconds. At 7:54 and 7:57 p.m., [Appellant] left voicemails with Washington, who responded with an outgoing call to [Appellant] at 8:24. Washington and [Appellant] next communicated at 9:21 p.m., before the instant shooting. Washington next placed several calls to [Appellant] between 9:40 p.m. and 9:41 p.m., and again between 10:01 p.m. and 10:09 p.m. that evening. In total, Washington's device recorded twenty-six communications between devices associated with Washington and [Appellant], all of which occurring within the time frame immediately before and after the murder.

Detective Lucke's analysis further revealed that, in the aftermath of the instant shooting, Washington deleted from his cell phone all records of his communications with [Appellant] and Thorogood that evening. Cell phone data extraction permitted Detective Lucke to recover some, but not all, of their communications.

Detective James Dunlap, an expert in cellular tower analysis, reviewed data from towers located at 8046 Erdrick Street and .6 miles away from the crime scene on Interstate-95, and identified numerous connection[s] between Washington's device and those towers between 8:04 p.m. and 9:54 p.m. on the night of the murder. Additional connections depicted Washington's device making two connections at a tower located at Rhawn Street and Roosevelt Boulevard, 1.5 miles away from the crime scene. Nine connections between 10:06 p.m. and 10:10 p.m. show the device travelling along Roosevelt Boulevard before making a connection with the tower at 1831 West Allegheny Avenue, which is associated with Washington's home address at 1931 West Willard Street. Analysis of the device associated with [Appellant] (215-880-7871) showed that it connected to the tower associated with the crime scene numerous times between 9:25 p.m. and 10:08 p.m. Analysis of the device associated with Thorogood revealed that the device was not in the area of the crime scene . . . at the time of the shooting.

Trial Court Opinion, 6/22/20, at 2-7 (citations omitted).

Appellant was arrested and charged with murder and other crimes. He and co-defendant Washington elected to waive their rights to a jury trial and proceeded to a bench trial. On December 4, 2019, the trial court found Appellant guilty of third-degree murder, burglary, and conspiracy to commit burglary. The court sentenced Appellant as indicated above on February 12, 2020. Appellant filed a timely post-sentence motion, which the trial court promptly denied.

On March 3, 2020, Appellant filed a timely notice of appeal. The trial court ordered Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal, and Appellant timely complied.[1] The trial court thereafter authored a Pa.R.A.P. 1925(a) opinion, and this appeal is ripe for disposition.

Appellant presents the following questions for our review:

1. Whether the evidence presented at Appellant's trial was insufficient to sustain the verdicts of guilty for murder in the third degree, burglary, and conspiracy to commit burglary.

2. Whether the verdict of guilty for third degree murder, burglary, and conspiracy to third degree murder was against the weight of the evidence, and as such, requires a new trial.

3. Whether the Commonwealth violated the rule promulgated in *Brady v. United States*, 397 U.S. 742 (1969)[,] by failing to disclose the material evidence of Mr. Gerald Morison's address prior to trial such that there was a

---

[1] While the statement was not filed within twenty-one days of the trial court's order, it was timely filed pursuant to our Supreme Court's orders concerning the COVID-19 statewide judicial emergency.

reasonable possibility that had this evidence been disclosed the result at trial would have been different.

4.      Whether the sentence imposed by the trial court was an abuse of discretion.

Appellant's brief at 6-7 (unnecessary capitalization omitted).

We begin with Appellant's sufficiency challenges, mindful of the following:

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

***Commonwealth v. Williams***, 176 A.3d 298, 305-06 (Pa.Super. 2017) (citations and quotation marks omitted).

We first address together Appellant's challenges to the evidence underlying his burglary and conspiracy convictions. The burglary statute provides, in pertinent part, as follows:

> A person commits the offense of burglary if, with the intent to commit a crime therein, the person:
>
>     (1)(i) enters a building or occupied structure, or separately secured or occupied portion thereof, that is adapted for

- 7 -

overnight accommodations in which at the time of the offense any person is present and the person commits, attempts or threatens to commit a bodily injury crime therein[.]

18 Pa.C.S. § 3502(a)(1)(i). "To sustain a burglary conviction, the Commonwealth is required to prove beyond a reasonable doubt that the offender entered the premises with the contemporaneous intent of committing a crime therein, at a time when he or she was not licensed or privileged to enter." **Commonwealth v. Jacoby**, 170 A.3d 1065, 1078 (Pa. 2017). A burglary is complete the moment the residence is entered. **See**, **e.g.**, **Commonwealth v. Tavarez**, 174 A.3d 7, 13 (Pa.Super. 2017).

The crime of conspiracy "requires proof of three elements: 1) an agreement, 2) shared criminal intent, and 3) an overt act." **Commonwealth v. Johnson**, 180 A.3d 474, 479 (Pa.Super. 2018). We have elucidated:

An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. Thus, a conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators sufficiently prove the formation of a criminal confederation. The conduct of the parties and the circumstances surrounding their conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt. Even if the conspirator did not act as a principal in committing the underlying crime, [he] is still criminally liable for the actions of his co-conspirators taken in furtherance of the conspiracy.

**Commonwealth v. Gross**, 232 A.3d 819, 839 (Pa.Super. 2020) (*en banc*) (cleaned up).

Appellant argues that the evidence "was insufficient as a matter of law to sustain the verdict of [conspiracy to commit] third-degree murder because there was no direct evidence to substantiate that Appellant entered into an agreement with his co-defendant and the unidentified individual to murder the decedent in the 8029 Erdrick Street property." Appellant's brief at 31-32. Likewise, he asserts that there was no evidence, such as forced entry, to suggest that he entered the residence "with felonious intent." *Id*. at 30.

Appellant contends that the evidence, "at best, demonstrates that Appellant may have been in the immediate area . . . and briefly communicated with his co-defendant via cell phone during the relevant time period." *Id*. at 34. While acknowledging that his fingerprints were found inside the apartment, Appellant cites the lack of forensic evidence in the bedroom where the decedent was killed as suggesting that Appellant was "merely present" when someone else murdered the decedent. *Id*. at 35. In sum, Appellant's position is that it was "purely speculative" for the fact-finder to conclude that Appellant "had colluded with [co-defendant] Washington or the unknown male to murder the decedent." *Id*. at 34-35.

Appellant's claim fails for several reasons. First, Appellant was not convicted of conspiracy to commit murder. On the record, the trial court indicated it found Appellant guilty of conspiracy without indication of the conspiracy's objective. *See* N.T. Trial, 12/4/19, at 60. However, the trial court's written verdict sheet clearly indicates that it found Appellant guilty of

"conspiracy – burglary." Trial Disposition and Dismissal Form, 12/4/19 (capitalization omitted). Hence, Appellant's arguments that the evidence at trial did not prove that he colluded with one or more other people to murder the decedent are inapposite.

Second, direct evidence is not required to prove conspiracy or any other crime. *See*, *e.g.*, *Gross*, *supra* at 839 ("[A] conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators sufficiently prove the formation of a criminal confederation. The conduct of the parties and the circumstances surrounding their conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt. (cleaned up)); *Williams*, *supra* at 306 ("The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence.").

Third, the evidence was sufficient that Appellant conspired with co-defendant Washington for Holder to enter the apartment at 8029 Erdrick Street and commit a felony therein. As the trial court explained:

> This court's guilty verdict was reached on the strength of overwhelming evidence that [Appellant] conspired with Washington to burglarize 8029 Erdrick Street. [Appellant] began communicating with Washington shortly after most inhabitants of the apartment had left. Data extracted from [Appellant]'s GPS monitor demonstrated that immediately after communicating with Washington, [Appellant] proceeded to travel to 8029 Erdrick Street. Upon arriving near that location, video surveillance evidence depicted Washington escorting [Appellant] and an unidentified individual towards the apartment.

- 10 -

Both GPS data and fingerprint evidence recovered from inside the apartment demonstrate that [Appellant] entered the apartment on the night of the shooting. In its investigation of the instant shooting, investigators were unable to recover the decedent's backpack, which possibly contained valuables and narcotics, evidences [Appellant]'s intention to commit the crime of theft upon entering the apartment. The discovery of documents that were removed from Vance's safe further demonstrates [Appellant]'s intent to commit theft inside the abode. Because of clear evidence demonstrating intent to commit a crime therein, both the conspiracy and the burglary were completed the moment [Appellant] entered the home. The evidence at trial was therefore sufficient to support the conspiracy and burglary charges, and the sufficiency claims fail.

Trial Court Opinion, 6/22/20, at 12-13 (unnecessary capitalization omitted).

The trial court's factual findings are supported by the record.[2] Therefore, we conclude that the evidence that Appellant, co-defendant, and another man approached the residence together following co-defendant Washington's communications, that Appellant entered the residence, rifled through belongings, and removed some, supports Appellant's burglary and conspiracy convictions. *See Commonwealth v. Donohue*, 62 A.3d 1033, 1037 (Pa.Super. 2013) (holding unexplained presence of defendant's fingerprints in burglarized residence was alone sufficient to support burglary conviction); *Commonwealth v. Rayner*, 153 A.3d 1049, 1056 (Pa. Super.

_____

[2] We additionally note that co-defendant Washington's act of attempting to erase all communications with Appellant from his cell phone after the incident suggests that the communications would evidence the parties' collective guilt. *Accord Commonwealth v. Paddy*, 800 A.2d 294, 319 (Pa. 2002) ("[A]ttempts by a defendant to suppress evidence are admissible to demonstrate his or her consciousness of guilt.").

Ct. 2016) (holding evidence of conspiracy sufficient where three men entered apartment and rob resident and forensic evidence identified the defendant as one of them).

We next turn to Appellant's challenge to the evidentiary sufficiency of his murder conviction. Regarding the elements of murder in the third degree, our Supreme Court has explained:

> To convict a defendant of the offense of third[-]degree murder, the Commonwealth need only prove that the defendant killed another person with malice aforethought. This Court has long held that malice comprehends not only a particular ill-will, but also a wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.

*Commonwealth v. Fisher*, 80 A.3d 1186, 1191 (Pa. 2013) (cleaned up).

Appellant argues that his murder conviction cannot stand "because there was no evidence that Appellant was physically inside the rear bedroom when the homicide was committed." Appellant's brief at 23. He maintains that, "even if Appellant was present in the property located at 8029 Erdrick Street, Appellant was merely present when the decedent was killed by [co-defendant] Washington and/or the unknown male." *Id*.

The trial court addressed Appellant's arguments as follows:

> The Commonwealth presented more than sufficient evidence to prove, beyond a reasonable doubt, that [Appellant] maliciously shot and murdered the decedent. On the night of the shooting, [Appellant] wore a GPS monitoring device which, due to his failure to maintain a sufficient charge, recorded [Appellant]'s location every fifteen seconds, as he travelled across Philadelphia towards the decedent's apartment. Inconclusive data caused by

- 12 -

interference with the GPS monitor indicated that [Appellant] was indoors at or near the location of 8029 Erdrick Street. Later investigation recovered one of [Appellant]'s fingerprints from a box of projectiles located inside 8029 Erdrick Street, proving that [Appellant] was inside the apartment. Neither Vance nor Noland, who resided in that apartment, had met or interacted with [Appellant] prior to the night of the shooting, and were not present in the domicile to grant [Appellant] access immediately before the shooting.

Video surveillance footage recovered along Erdrick Street depicted [Appellant] wearing a GPS tracking device and carrying an object while running away from the residence, which this court concluded was a firearm. An autopsy of the decedent's body revealed that he was killed by one gunshot wound to the head, resulting in instant death. This evidence is sufficient to support [Appellant]'s third-degree murder conviction.

Trial Court Opinion, 6/22/20, at 11-12.

Again, the trial court's factual findings are supported by the certified record. We agree that the evidence that Appellant fled the scene with a firearm distinguishes this case from those in which the Commonwealth merely proved that the defendant was present at the scene of the crime. *Cf*., *e.g.*, *In Interest of J.B.*, 189 A.3d 390, 417 (Pa. 2018) (holding that evidence that a shotgun was found in juvenile's bedroom was insufficient to support delinquency adjudication for murder, where the decedent was discovered in the family's unlocked house forty-five minutes after the juvenile left for school and the weapon contained no physical evidence of the shooting; evidence was equally consistent with juvenile's guilt or innocence).

Moreover, as the Commonwealth notes, the evidence supports Appellant's conviction on a complicity theory even if co-defendant Washington

or the third, unidentified man was the one who actually fired the fatal shot. *See* Commonwealth's brief at 12 (citing ***Commonwealth v. Roebuck***, 32 A.3d 613, 624 (Pa. 2011) ("[A] conviction for murder of the third degree is supportable under complicity theory where the Commonwealth proves the accomplice acted with the culpable mental state required of a principal actor, namely, malice."). ***See also Commonwealth v. King***, 990 A.2d 1172, 1179 (Pa.Super. 2010) (affirming murder conviction on theory of conspiracy liability where the evidence that demonstrated that the defendant agreed with the shooter to commit the robbery in question, the defendant knew that the shooter had a gun, and that the shooting was a probable result of the robbery). Thus, we discern no reason to disturb Appellant's murder conviction.

Next, Appellant argues that the trial court erred in denying his request for a new trial based upon the weight of the evidence. The following legal principles apply to our review:

> Appellate review of a weight claim is a review of the [trial court's] exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Clay*, 64 A.3d 1049, 1054-55 (Pa. 2013) (cleaned up). This standard applies even when the trial judge was also the finder of fact. *See Commonwealth v. Konias*, 136 A.3d 1014, 1022 (Pa.Super. 2016) (reviewing exercise of discretion rather than weight of the evidence in appeal from non-jury verdict).

> The trial court addressed Appellant's claim as follows:
>
> [T]the Commonwealth presented significant physical evidence, cell tower data, phone extraction data, and video evidence demonstrating that [Appellant] conspired with Washington to enter 8029 Erdrick Street, where he ultimately shot and killed the decedent. GPS tracking and fingerprint evidence was sufficient to prove that [Appellant] was inside the home, searching for and ultimately removing valuables. Both the conspiracy and the underlying act of burglary were completed once [Appellant] crossed the threshold into the apartment. Video evidence clearly depicted [Appellant], armed with a pistol, running away from 8029 Erdrick Street immediately after the instant shooting. Every parcel of this demonstrative evidence went uncontested at trial. Accordingly, the weight of the evidence tips the scale wholly in favor of the third-degree murder, burglary, and conspiracy convictions, and the instant claim fails.

Trial Court Opinion, 6/22/20, at 14-15.

Appellant offers no claim or discussion of how the trial court's denial of his weight claim was an abuse of discretion. Instead, he reasserts the same sufficiency challenges that we have already rejected and suggests that the evidence should have been resolved in his favor. Accordingly, no relief is due. *See Commonwealth v. Soto*, 202 A.3d 80, 97 (Pa.Super. 2018) (denying relief on weight claim that was based "on the same arguments that he raised in support of his challenges to the sufficiency of the evidence" and the

suggestion of "an interpretation of the trial evidence in a light most favorable to him").

Appellant next claims that the trial court erred in denying relief on his *Brady* claim. "This issue presents a question of law, for which our standard of review is *de novo* and our scope of review is plenary." ***Commonwealth v. Bagnall***, 235 A.3d 1075, 1084 (Pa. 2020). Our Supreme Court summarized the law relevant to the adjudication of such claims as follows:

> The law governing alleged ***Brady*** violations is well-settled. In ***Brady***, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. The Supreme Court subsequently held that the duty to disclose such evidence is applicable even if there has been no request by the accused, and that the duty may encompass impeachment evidence as well as directly exculpatory evidence. Furthermore, the prosecution's ***Brady*** obligation extends to exculpatory evidence in the files of police agencies of the same government bringing the prosecution.
>
> On the question of materiality, the Court has noted that such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. The materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Thus, there are three necessary components that demonstrate a violation of the ***Brady*** strictures: the evidence was favorable to the accused, either because it is exculpatory or because it impeaches; the evidence was suppressed by the prosecution, either willfully or inadvertently; and prejudice ensued.

***Commonwealth v. Lambert***, 884 A.2d 848, 853-54 (Pa. 2005) (cleaned up).

- 16 -

Appellant contends that the Commonwealth committed a ***Brady*** violation by willfully failing to disclose the address of potential witness Gerald Morrison. ***See*** Appellant's brief at 39. The trial court denied relief on the claim, holding that Appellant demonstrated neither that the Commonwealth suppressed evidence, nor that he was prejudiced. It explained as follows:

> At trial, the defense called witness Kyle Page, who testified that on February 4, 2017, he received a text message from Morrison. Detective Jeffrey Burke interviewed Page and read the text message, which said that Morrison shot "that dude D" in the Holmesburg section of Philadelphia four weeks prior, matching the date and general location of the instant murder. On October 31, 2020, in preparation for the instant trial, [Detective] Burke spoke to Morrison at his known address, and documented the interview on his activity sheet, which was provided to the defense.
>
> On the last day of trial, defense counsel informed this Court that he intended to subpoena Morrison, but Morrison's address was missing from the activity sheet, preventing him from doing so. In response, the Commonwealth explained that Morrison's name was included in discovery, which was provided to counsel at the time the matter was scheduled for trial. The Commonwealth had not subpoenaed Morrison for trial, and until Detective Burke's testimony the day before, the defense had not requested Morrison's address.
>
> Based on the totality of the above circumstances, it is clear that the Commonwealth did not suppress Morrison's address to prevent his testimony, and [Appellant] cannot demonstrate prejudice. Morrison was identified as a potential witness within discovery, granting the defense an opportunity to interview him in preparation for trial. Though the copy of the activity sheet did not include Morrison's address, the address could have been obtained by defense counsel upon request, and defense counsel did not make such a request until after trial commenced.
>
> Moreover, [Appellant] fails to show how Morrison's testimony would have altered the result of the proceeding. While examining witness Page on direct, the defense elicited that Morrison sent Page an incriminating message one month after the

shooting. Through its examination of Detective Burke, the defense further elicited the contents of that message, which implied that Morrison took credit for killing an individual named D at the time and location of the instant homicide.

This [c]ourt balanced the possibility of Morrison's involvement with the other direct and circumstantial evidence presented at trial. While video evidence establishes that [Appellant] arrived at 8029 Erdrick Street with an unidentified individual, having Morrison possibly identified as that individual would not alter the instant verdict, as video surveillance evidence identifying [Appellant], GPS data tracking him, and fingerprint recovery identifying him as having been present in the home, all unequivocally establish [Appellant]'s involvement in and guilt of the instant offense. Not only did the absence of Morrison's address-information that was readily available to the defense upon request-from discovery fail to change the outcome of this case, but it fails to tarnish the fairness of the trial itself. For those reasons, the instant claim fails.

Trial Court Opinion, 6/22/20, at 9-10 (citations omitted).

We conclude that the trial court's analysis is sound. The case law relied upon by Appellant in supporting his claim relates to instances in which the Commonwealth failed to disclose the very existence of a potentially-exculpatory witness. *See* Appellant's brief at 40-41 (discussing ***Commonwealth v. Moose***, 602 A.2d 1265, 1271 (Pa. 1992) (finding Brady violation where Commonwealth did not disclose identity of witness until the day of trial, and failed to disclose before the defendant's conviction the fact that it had offered the witness leniency in exchange for his cooperation).

Here, it is undisputed that the Commonwealth timely identified Morrison as a potential witness. It was Appellant's failure to follow up on the information duly supplied by the Commonwealth that resulted in his inability

to procure a statement or testimony from Morrison. Appellant tacitly concedes in his brief that his real claim sounds in ineffectiveness of counsel for his failure to investigate Morrison. *See* Appellant's brief at 42. However, as Appellant acknowledges, that claim is properly raised not on direct appeal, but in post-conviction collateral proceedings. *Id*. at 42 n.4 (citing *Commonwealth v. Grant*, 813 A.2d 726, 728 (Pa. 2002)). As Appellant has not established that he suffered prejudice as a result of the Commonwealth's suppression of favorable evidence, his *Brady* claim does not warrant relief.

In his final issue, Appellant seeks to challenge the discretionary aspects of his sentence. The following legal principles govern our consideration of his claim:

> An appellant is not entitled to the review of challenges to the discretionary aspects of a sentence as of right. Rather, an appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction. We determine whether the appellant has invoked our jurisdiction by considering the following four factors:
>
> > (1) whether appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether appellant's brief has a fatal defect; and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

*Commonwealth v. Lucky*, 229 A.3d 657, 663-64 (Pa.Super. 2020) (internal quotation marks omitted).

Appellant filed a timely notice of appeal and preserved the issue in a timely post-sentence motion seeking reconsideration of his sentence.

- 19 -

Appellant's brief does not contain a statement of reasons relied upon for his challenge to the discretionary aspects of his sentence as required by Pa.R.A.P. 2119(f). However, since the Commonwealth has not objected, we decline to find waiver on that basis. Rather, we shall consider whether Appellant has raised a substantial question. *See Commonwealth v. Kiesel*, 854 A.2d 530, 533 (Pa.Super. 2004) ("[W]hen the appellant has not included a Rule 2119(f) statement and the appellee has not objected, this Court may ignore the omission and determine if there is a substantial question that the sentence imposed was not appropriate. . . .").

Appellant contends that the trial court improperly "focus[ed] solely on Appellant's alleged role in the crime alone . . . instead of examining all the sentencing factors set forth in 42 Pa.C.S. § 9721(b)[3] including Appellant's demonstrable need for mental health rehabilitation and drug counseling for his deep-rooted childhood trauma." Appellant's brief at 48. We conclude that Appellant has presented a substantial question warranting our review. *See*,

_____

[3] This statute provides, in relevant part:

> the court shall follow the general principle that the sentence imposed should call for total confinement that is consistent with section 9725 (relating to total confinement) and the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant. The court shall also consider any guidelines for sentencing and resentencing adopted by the Pennsylvania Commission on Sentencing . . . .

42 Pa.C.S. § 9721.

*e.g.*, *Commonwealth v. Derrickson*, 242 A.3d 667, 680 (Pa.Super. 2020) (finding substantial question presented by claim that the sentence was based solely on the seriousness of the crime without consideration of all relevant factors). Accordingly, we proceed to review the merits of Appellant's sentencing challenge.

"When reviewing sentencing matters, this Court must accord the sentencing court great weight as it is in the best position to view the defendant's character, displays of remorse, defiance or indifference, and the overall effect and nature of the crime." *Commonwealth v. Edwards*, 194 A.3d 625, 637 (Pa.Super. 2018) (cleaned up). "We cannot re-weigh the sentencing factors and impose our judgment in the place of the sentencing court." *Commonwealth v. Macias*, 968 A.2d 773, 778 (Pa.Super. 2009). Hence, we review the sentencing court's sentencing determination for an abuse of discretion.

> In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Antidormi*, 84 A.3d 736, 760 (Pa.Super. 2014).

While its discretion is broad, "the trial court's discretion is not unfettered." *Commonwealth v. Coulverson*, 34 A.3d 135, 144 (Pa.Super. 2011). "When imposing sentence, a court is required to consider the particular circumstances of the offense and the character of the defendant. In

considering these factors, the court should refer to the defendant's prior criminal record, age, personal characteristics and potential for rehabilitation." **Antidormi**, **supra** at 761 (citations and quotation marks omitted). "And, of course, the court must consider the sentencing guidelines." **Coulverson**, **supra** at 144 (cleaned up). The sentence "should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S. § 9721(b).

The trial court addressed Appellant's sentencing challenge as follows:

> This court imposed standard range sentences of seventeen and one-half to thirty-five years of imprisonment for third-degree murder and five to ten years of imprisonment for burglary. In imposing these sentences, this court considered every factor required under the sentencing code and imposed a sentence that was not only necessary for the protection of the public, but one that also reflected the significant threat [Appellant] posed to the community. This court reviewed [Appellant]'s presentence and mental health reports, which revealed that he had previously been convicted of two unrelated drug offenses. While [Appellant] suffered from no significant medical or mental health issues that would interfere with sentencing, this court did note that [Appellant] suffered from a significantly traumatizing childhood, having witnessed his uncle's murder at the age of five and suffering sexual abuse that went unreported to family members. This court also considered testimony from Nora Holder, [Appellant]'s wife, and Dontay Holder, his brother.
>
> This court was obligated to balance these considerations with the gravity of the instant offense. The evidence unequivocally demonstrated that [Appellant] entered the decedent's home and sought to steal valuables before encountering the decedent, whereupon he shot him once in the head, killing him instantly. [Appellant] performed this action while wearing a GPS ankle monitor pursuant to his supervision under the Pennsylvania State Parole Board. This fact alone

demonstrates [Appellant]'s unwillingness to comport his behavior to that of a responsible citizen, and his complete disregard for the rehabilitative efforts taken by the criminal justice system to aid him in living a productive life. [Appellant]'s brazen flouting of the court system's previous efforts gave this court serious pause in considering the applicable penalty in this matter, and ultimately precluded any significant show of mercy for this far more serious, subsequent offense. This court's imposition of a standard range sentence is a sign of lenience in this matter. Accordingly, [Appellant] fails to demonstrate that this court abused its discretion in imposing sentence, and this court's sentence should not be disturbed.

Trial Court Opinion, 6/22/20, at 16-17 (citations and unnecessary capitalization committed).

Our review of the record supports the trial court's contentions and belies those of Appellant. First, because the court studied the presentence investigation report, we presume that it properly considered and weighed all relevant sentencing factors. *See*, *e.g.*, *Commonwealth v. Kitchen*, 162 A.3d 1140, 1147 (Pa.Super. 2017). Additionally, the record confirms that the trial court fully assessed the relevant factors, restating in open court the information pertinent to Appellant's history and rehabilitative needs, as well as entertaining Appellant's witnesses and his allocution, in which Appellant offered sympathy and condolences to the decedent's family but denied that he had anything to do with the murder. *See* N.T. Sentencing, 2/12/20, at 80-109.

Upon this record, we discern no indication that "the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision."

***Antidormi***, ***supra*** at 760.  The trial court clearly considered all pertinent sentencing factors, including the sentencing guidelines, and imposed concurrent, standard-range sentences.  Such was not an abuse of discretion, and no relief is due.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/25/2021